The next case today is 524-0185, People v. Everitt. Arguing for the appellant is Christopher Gerke. Arguing for the appellee is Justin Nicolosi. Each side will have 10 minutes for their argument. The appellant will also have 5 minutes for rebuttal. Please note, only the clerk of the court is permitted to record these proceedings today. Afternoon, counsel. Good afternoon. As you can see, Justice Barbaras is not present. He will be listening to a recording of this oral argument and will be participating in the ultimate disposition of the case. With that said, appellant, if you are ready to proceed, you may proceed. Thank you, Your Honor. May it please the court, my name is Christopher Gerke. I represent the appellant, Randall Everitt, in this case. I'd like to briefly address the as-applied Second Amendment challenge before I move on to the jury waiver issue. But of course, I'm more than happy to speak about whatever Your Honors want to hear from me about. Your Honors, Randall Everitt is a 61-year-old military veteran who possessed a gun in his home. Now, that was a crime under the UPWF statute because he had been convicted of nonviolent offenses 25 years prior. Because that statute, my client's conduct clearly implicates the Second Amendment, and because the state has failed its burden to show a historical analog both below in the trial court when this issue was raised, and again on appeal, we ask you to find that the Second Amendment was violated at least as applied to my client and reverse his conviction. Now, the Bruin test, as Your Honors are well aware, has two steps. The first step is the text, which is a straightforward proposition. Bruin asks whether, quote, the Second Amendment's plain text covers an individual's conduct. Here, the conduct is firearm possession. That clearly implicates the Second Amendment, and therefore we move on to the second step, which is history. If the first step is met, then the UPWF statute is presumptively unconstitutional, which means that it's the state's burden to show a historical, a consistent and well-established historical principle that's relevantly similar to both how and why the UPWF statute restricts firearm rights. The only historical principle that we know for sure exists comes from Rahimi, which is the United States Supreme Court decision, which recognized that there is a tradition in history of temporary restrictions on firearm rights for dangerous persons. This court in Stevens recognized, similarly recognized, that there's a historical practice of restricting firearm use to those who threaten to do harm. And with respect to opposing counsel, I didn't under, I couldn't really grasp what the historical principle that the counsel citations was referring to. There's a lot of citations in there. But at best, I think if you look at all of them together, and even the quotes that are used in an opposing counsel's brief, they include many references to dangerous people, to violent people. And so even assuming that for the sake of argument, that the unlawful possession of a weapon statute is constitutional, facially constitutional, then that rationale of dangerousness does not apply as applied to my client. In this particular case, the UPWF statute denied my client's firearm rights for his entire life, based solely on nonviolent paperwork offenses, credit card fraud and social security fraud that happened more than 25 years ago. My client has never been convicted of a violent offense. My client has not been convicted of any offense until this incident in 25 years. So under the particular circumstances of this case, the UPWF statute as applied to my client is incompatible with any historical tradition relating to dangerousness, and therefore violates the Second Amendment as applied to my client. And I'd like to direct, before I move on, I'd like to direct your honor's attention to the Range case in the Third Circuit Court of Appeals, which was just decided in 2024, where in a very similar situation, that court found that the Second Amendment was violated as applied to an individual where they lost their firearm rights, based solely on the fact they were previously convicted of 25-year-old welfare fraud case. So for those reasons, your honors, I respectfully ask that you find at the very least that the Second Amendment was violated as applied to my client, because he is not the kind of dangerous person for whom the founders historically restricted firearm rights. Now, unless your honors have any questions about the Second Amendment, I'll move on to the involuntary jury waiver issue. Your honor, my client very clearly wanted a jury trial. He said it over and over again at pretrial hearings, but he's essentially browbeat into waiving that right, which he immediately regretted and tried to change before reiterating his off-stated, previously stated desire for a jury trial. Under, if you look at the record of this case, your honors, you're not going to see a basis to find that my client's, or a valid basis to find my client voluntarily waived his right to a jury trial. So multiple court dates preceding his waiver, my client made, again, repeated vocal statements expressing his desire for a jury trial, to which the court directly responded by saying that, telling him that he was mentally unfit or mentally ill for wanting that, even though a fitness hearing later showed that he had normal intelligence and no mental health issues related, that would be relevant to this. The court repeatedly told him that the court, even though no trial had been happened yet, the court believed he was guilty, that the state had overwhelming evidence against him, and that he would lose at a jury trial. The court went on to tell him that he had no defense or witnesses to present at a jury trial. The court said, quote, he doesn't have a defense, quote, I'm at a loss as to how you plan to proceed. When my client expressed that he had some impeachment evidence he'd like to use to attack the credibility of a state's witness, the court said, none of those recognizable defenses, quote, those would be deemed irrelevant. My client even expressed his desire to, he wanted a jury trial so badly, he expressed desire to pursue even a jury nullification strategy. Which the court said that can't and won't happen in my courtroom. So these comments very clearly conveyed to my client that he should not proceed with a jury trial, that doing so meant that he was essentially crazy, that he was mentally ill, that any trial would be in front of a judge that had prejudged his guilt before a trial, that he had no chance of winning, he couldn't even pursue a jury nullification strategy, leaving him essentially no choice but to waive his right to a jury. And of course, the court had no business telling my client anything about his defense strategy. As the Illinois Supreme Court recognized in Medina and as the Seventh Circuit recognized in Goodwin, it's inappropriate for a judge to make those kind of comments. And even worse, those comments repeatedly misrepresented the burden of proof in my client's constitutional rights. Telling my client that he was guilty before a trial obviously contradicts the presumption of innocence. Telling my client that he had no defense or witnesses to present quite obviously suggested that my client had some burden to present defense evidence when of course it is not, and the state has the sole burden to prove its case. Telling my client that he couldn't present his impeaching evidence contradict my client's right to attack the sufficiency of the state's evidence. So it was only in the context of those statements, which again were made in response to my client's expressed desire for a jury trial, that my client changed his mind. He went from repeatedly saying, I want a jury to agreeing to do a waiver. But even that waiver was extremely brief. The record shows that immediately after the waiver, on the same day as the waiver, an off the record meeting with the judge and counsel, my client had the stipulated bench trial explained to him. That's what he waived his jury right for. And in that, after that more extensive discussion of his stipulated bench trial, my client said that that quote, kind of clinched his desire for a jury trial instead of the stipulated bench trial. So that's a long way of saying, your honors, that my client immediately changed his mind about his jury right the same day, perhaps an hour, hours after that happened. And that the first opportunity, when he appeared in court three days later, he wanted to withdraw his jury trial. I'm sorry, he wanted to withdraw his jury waiver. And for good reason, that as I point out in my brief, he received essentially no sentencing benefit for stipulated bench trial for a jury waiver. He would have been essentially the same or a better position with a jury trial as he would have been with a bench trial. So, your honors, this is not a case where, like the case of the state sites and tools, where a defendant is essentially silent through all the pretrial proceedings, they're admonished and waived their case. I'm sorry, they're admonished and waived their jury right, and then later regret it. This is a case for my client. The record clearly shows that my client repeatedly, vocally won his right to a jury trial, that those expressions of that valid right were met with improper judicial comments that he should not pursue a jury trial, and that my client briefly waived that right, changed his mind immediately the same day and tried to withdraw his waiver just three days later. So, looking at the circumstances of this case de novo, as your honors are required to do, and looking at the fact the United States Supreme Court and the Rambo case inside my brief make it clear that courts must indulge in every reasonable presumption against the waiver of fundamental constitutional rights. We ask you to find that my client's jury waiver was not valid, was involuntary, and reverse and remand for a new trial. Any questions, Justice Schiller? Not at this time. All right, thank you, counsel. You'll be given time for rebuttal. I believe you may proceed. Good afternoon, your honors. May it please the court. Mr. Gerke, my name is Justin Nicolozzi. I represent the state in this case, and the state submits that this court should find that the defendant's constitutional challenge to the UPWF statute is rejected. Counsel, when the as-applied analysis first, of course, up to the Bruin analysis, people submit that this court shouldn't even get past the first step of that analysis. I understand in Stevens, this court did find as one of the few courts that found that a person who has been convicted of a felony remains part of the people, end quote, that are, that maintain the rights in the second amendment. The state submits, of course, that is contrary to almost all of the analysis of the same issue in all the districts in Illinois. They have a couple of outlier cases in the first district. You know, again, if we're looking at Bruin, which kind of kickstarted this whole wave of these UPWF cases, Bruin mentions law-abiding citizen, that phrase 18 times. In no uncertain terms, insisted that analysis only applied to those people who were law-abiding citizens, people who have felonies on the record. By any definition or not, law-abiding citizens have not been for the entirety of their lives. That's what all these cases from the first, second, third, and fourth have established, and then the state submits. There's simply no reason to depart from that at most findings. In those other cases that the state requested, this court kind of reverts its path that it established in Stevens last year and find that the defendant does not have the presumption of protection in the Second Amendment regarding the first Bruin prong. But regarding the second prong and the as-applied, regarding the fact that the dichotomy versus violent and non-violent, I argue in my brief, this issue has come up many times, both before and after Bruin. Almost every district, I believe, except for the fifth, and all the courts have found that the legislature has historically made no difference. It has made no difference between violent and non-violent felonies regarding this particular statute. And going back to what I argued in my brief regarding the historical analogs, again, they don't need to be twins. The Bruins required in the cases that have followed Bruin in this state have affirmed that we're not looking for a twin. We're just looking for analog. There's been a historical, going back 200 years plus, there's been a consistent pattern of support for disarming people who have committed felonies in the state. And a lot of those analysis, the cases that we're talking about, Bruin talked about maturity laws. These things don't necessarily differentiate between violent and non-violent. That's what all these cases recently in the other districts of the state have stressed that the legislature has made no difference. Historically, there's been no difference. Well, we understand defendants is arguing this issue, but it's not a new issue. It's not a novel issue. It's been addressed many times. It's been rejected every time this court should continue to follow the persuasive authority throughout the rest of the state. But there's just no difference. So are you saying these surety laws are analogs? Yes. Aren't those temporary? All you do, you post a bond. Once the reason for posting the bond expires, you get your gun back, don't you? Yes, yes, Your Honor. But this specific issue of permanence has been discussed in other courts in the second district in Miller and the third district in Morales. As I said in my brief, they discussed the issue of permanency. And again, it points to the analog phrase and the fact that laws throughout history evolve and the needs of modern times, modern laws are different than those in the way past. It has rejected any of the arguments in Morales and Miller. It rejected the defendants' arguments that are similar to the defendants here today regarding the fact that this law is permanent. And Morales even noted, this law is not permanent. There is a FOIA card exception. But again, I'm pointing to the precedent that the second and third have established on this issue. And that's, you know, we're looking for analogs, not identical twins. We don't have to point to something in the past where a permanent disarmament statute has existed. Yeah, there's nothing but support in the history of the laws and the founders and legislators who have steadfastly maintained that the legislature can disarm individuals in felonies regardless of whether they're violent or nonviolent. Well, counsel, a convicted felon, once you get out of the joint, you still have a right against unreasonable searches and seizures, don't you? Yes. You still have all the other rights applicable in the Bill of Rights. Why can you not have a gun if you got the other rights? Well, your honor, again, because again, there's a historical tradition of disarming felons. That's been, that has not changed in I don't know how many years, but we're talking about treatises and laws. This court cited Gates, which is a federal case from 2023 and Stevens, this court cited that one, which thoroughly discussed rhetorical analogs. And in my brief, I talked about federal cases. Again, this issue has been hashed. Your honor, to answer your specific question, because the legislature has a history and an ability to take guns away from people who commit felonies. That's nothing new. Even in Bruin, Justice Kavanaugh and other justices said that nothing from that opinion should change the legislature's ability to disarm individuals. You know, it's again, it's not without precedent. It's not like this is coming out of nowhere that this has been done in the past and it can continue to be done because there's a rational basis behind it. That people have committed felonies in the past. Certainly possible if they do so in the future, having a gun, you know, could only give those people access to chances to maybe even more serious felonies than they have in the past. You know, again, this is just simply not a novel issue. It's been litigated heavily since Bruin and the state submits to this court should simply follow the established law that has been the mountain of precedent that has been established at this point. Okay. I only have a couple of minutes to move on to the jury waiver. You know, the state acknowledges that the court made some comments here early in pretrial proceedings, but the state submits to the record, establishes that those comments did not have any effect on defendant waiving jury. The defendant, the record shows the defendant maintained his jury trial rights up until the day before jury trial was supposed to start. And he only waived it after his motion to suppress was denied and after a lengthy conversation with his attorney. So yeah, the court commented on the strength of the evidence and the fact that the defendant didn't appear to have a defense. We're acknowledging that those comments were improper, but those happened well before anything regarding his actual jury waiver. And again, defendant maintained his jury trial rights even after all those comments, but comments didn't have anything to do with defendant waiving. He clearly talked to his attorney after that motion suppressed did not go his way. After he came back and defendant, the defense informed the court it wanted to waive jury. The court admonished the defendant, questioned him regarding his jury trial rights and defendant said he understood it. He wasn't coerced. He wasn't pressured. He knew what he was doing. He was not under the influence. I think the record establishes a pretty annoying and involuntary waiver of his rights with jury trial. State, you're acknowledging that some of these comments were improper, correct? Yes, yes, absolutely, yes. You're saying there's no basis to claim that those improper comments had anything to do with him waiving, right? Right. Well, can't the opposite argument be made? And that maybe is precisely because the reason he waived because the trial court told him he was dead meat. That was long before he actually waived. He held on to his jury trial, right? Up until the day before trial, right? You know, that's the record establishes that unequivocally. Well, maybe the trial court finally wore him down. But I don't think it, I think the record doesn't establish that, Your Honor. If the court, quote, wore him down, it was very early in the proceedings. And the fact that the defendant emerged from those comments with his jury trial rights intact showed that he was not, quote, worn down. I see my time is up. If there are any other questions. I have a question though. Along those same lines though, he very quickly essentially recanted and said, look, I made a mistake. I want my jury trial, right? I mean, doesn't the timing of that, because it was within days, correct? I believe so. Yes, Your Honor. Within days. I mean, doesn't the timing of that sort of go towards his state of mind, essentially? Your Honor, or it could be that he's just waffling and trying to delay and trying to kind of make a mess of the proceedings at that point. Again, I think the record, the judge has the discretion to deny such a request from the defendant to reobtain his jury trial right. And I think, again, as I argued earlier, that the record establishes the defendant's waiver of jury trial was knowing and voluntary. He knew what he was doing. He wasn't under the influence. He wasn't forced. He wasn't pressured. He talked to his lawyer extensively before that. I think that... Counsel, remind me at what point in the proceeding were the improper comments made? I mean, how much, speaking of timing, how much time was between those comments and the actual... I apologize, Your Honor. Off the top of my head, I don't know how many months were in between. I just know that it was early in proceedings and some hearings and things happened in between. I could look that up and give the court that information after counsel's rebuttal if this court would back. I'd appreciate that. Okay. Thank you. With that, I have no other comments. If there are any other questions, I'd be happy to answer. All right, thank you. Rebuttal? Yes, Your Honor. With respect to the Second Amendment issue, opposing counsel really focused his argument on the idea that my client doesn't qualify as one of the people, the phrase, the people within the Second Amendment because he has a prior felony. I'll point out, as he did, that this court rejected that exact argument in Stevens. Other Illinois courts have rejected that argument in Brooks and in Travis. As far as I'm aware, several federal courts of appeals have rejected that argument. The Third District, the Fifth, the Sixth, the Seventh, and Ninth have all rejected that argument. And that's because it's inconsistent with Heller. Heller maintained that there's a strong presumption, and that's Heller's words, that the Second Amendment applies to, quote, all Americans and not an unspecified subset. And also, to go along with opposing counsel's argument, you'd have to read the phrase, the people, within the meaning of the Second Amendment, as Your Honor pointed out, as having different meanings throughout the rest of the Constitution. As Your Honor pointed out, someone who's convicted of a prior felony still has the right to free speech and to Fourth and Fifth Amendment rights. So we ask you to reject that argument as you did in Stevens. As far as the violent, nonviolent distinction, opposing counsel emphasized that the legislature doesn't distinguish between violent and nonviolent offenses, which is true. But of course, the legislature doesn't decide what's constitutional or not. The United States Supreme Court and this court does. And the United States Supreme Court has made it clear that the constitutional approach is to look at the historical test. As we explained, the historical test, including opposing counsel's own authority, shows, if anything, that there's a historical basis to prevent people who are presently dangerous from possessing guns and only temporarily, which is certainly not the case here. And that doesn't apply as applied to my client for the reasons I explained. The state also points to surety laws. Again, that's the same thing, that Rahimi recognized the dangerousness test, which doesn't apply to my client. Counsel asserted that as far as the permanence, as far as the light, the fact that UPWF imposes a lifetime ban, he argues that it's still relevantly similar to impose a temporary ban, which of course just can't be true. There's a huge difference between historical laws imposing a temporary ban, and Rahimi, it was a couple of years, to imposing a lifetime ban of fundamental constitutional right. And so that's not relevantly similar as far as how the right is regulated. As far as the jury waiver issue, your honors, I'd like to talk about the idea that opposing counsel argues that there was no effect that the judge's comments gave on my client's decision to waive his jury right. I'd like to remind the court the review of this is de novo. So it's your honor's decision, it's your honor's job to look at the record and determine whether the record reflects that my client voluntarily waived his right. And assuming the presumption against a waiver of a fundamental constitutional right. And so I'm not sure what counsel means when he keeps saying that my client maintains his jury rights, considering that every time he did maintain his jury right, the court responded by telling him essentially either that he was crazy or that he would lose at a jury trial or that he had no defense to put on. And those statements stack up. And again, the state admits that those statements are improper. And again, they were made in direct response to my client's assertion of his right. Counsel points out that my client spoke to his attorney, but it's not clear what they spoke about. But it is clear that my client, as I explained in detail in my brief, inured no benefit from his decision to choose a stipulated bench trial over a jury trial. He would have been the same or better position had he just went with the jury trial, which is what he wanted all along. And as your honor pointed out, he immediately changed his mind. And it wasn't just a couple of days later, that's when he formally asked to withdraw his plea. I'm sorry, to withdraw his waiver. But the record shows that he changed his mind that same day immediately after the waiver happened. He explained at a later proceeding that on the day the waiver happened, there was an off the record discussion between him and counsel and the judge. And after that discussion, he wanted his jury trial right back, which is what he'd been expressing the entire time before that. So in the totality of all of these circumstances, your honors, and keeping in mind the idea that, again, courts have to indulge in every reasonable presumption against the waiver of fundamental constitutional rights. And considering what Rambo said, which is cited in my brief, that any question about the validity of a waiver must be resolved in favor of the accused. I respectfully ask that you find that my client's jury waiver was not voluntary and or that his Second Amendment rights were violated as applied to him. Any final questions, Judge O'Shaughner? No questions. All right. Thank you, counsel, for your arguments. We will take this matter on advisement. You may have an answer. The appellee may have an answer to my question. Go ahead. I did. I was flipping through my brief frantically, and it looked like the comments in question occurred on mainly two hearings, October 11th, 2023 and October 16th, 2023. And it looks like the waiver of jury occurred on January 22nd, 2024. So there was a little over three months in between where the defendant still had his jury trial rights and maintained that ability. All right. Thank you. All right. Thank you. We'll take this matter in advisement and issue a ruling in due course. Thank you.